IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA



FILED
MAR 27 2015
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

**Alexandria Division**

|  |  |
|---|---|
| DAMIEN BARKER, <br>           Plaintiff, <br> -v- <br> COMPUTER SCIENCE CORPORATION, <br>           Defendant. | Civil No. 1:13-cv-857 <br><br> Hon. Liam O'Grady |

**MEMORANDUM OPINION**

Before the Court are the defendant's motions for summary judgment and to strike certain of plaintiff's exhibits. (Dkt. Nos. 74, 86). The plaintiff has opposed both motions, (Dkt. Nos. 81, 92), and the defendant has replied. (Dkt. Nos. 89, 94). Having carefully considered the pleadings and exhibits and heard oral argument, the Court hereby GRANTS summary judgment. The motion to strike is GRANTED in part and DENIED in part.

**I. BACKGROUND**

Plaintiff Damien Barker ("Plaintiff" or "Barker") began his employment with Computer Science Corporation ("CSC") in February 2011 as a systems analyst. (Dkt. No. 77-6 at 2-3). In this position, he provided technical support to the United States Marine Corps ("Marine Corps"), a CSC client. Plaintiff's immediate supervisor was Nick Avenetti ("Avenetti"), and his secondary supervisor was Program Manager Judith Shaw ("Shaw"). *Id.* Captain Howard Smith ("Capt. Smith") served as the Marine Corps Operations Officer at Camp Pendleton. *Id.* Richard Pennington ("Pennington") was CSC's Operations Director. (Dkt. No. 77-3 at 2).

1

Plaintiff alleges that beginning in March 2011, his coworkers made inappropriate racial comments and jokes toward him.[1] (Dkt. No. 81 at 2). Plaintiff testified in his deposition that early in his employment, Sergeant Dieter Schirrmacher ("Sgt. Schirrmacher")[2] and Jeremiah Mooney ("Mooney") made jokes at a barbeque about Barker making pan-fried chicken. (Dkt. No. 81-25 at 21). Plaintiff also alleged that Mooney and Sgt. Schirrmacher made jokes about racial stereotypes involving watermelons. (Dkt. No. 90-1 at 2, 7).

In July 2011, Corporal Connie Salgado ("Cpl. Salgado")[3] sent Plaintiff an email asking him whether checking his email was in the "BLACK PANTHER PERMISSION HANDBOOK. BAHAHAHA…JK." (Dkt. No. 81-6 at 2). He testified that she told him he drove a "black man's car" and he was the "whitest black man" she had ever seen. (Dkt. No. 78-1 at 67). Plaintiff stated that Mooney also made comments during that conversation about his vehicle, calling it a "hood car" and a "black man's car." (Dkt. No. 81-25 at 22).

On another occasion, Mooney left four Kentucky Fried Chicken (KFC) coupons on Plaintiff's desk. (Dkt. No. 81-25 at 18). Mooney stated in his declaration that he gave KFC coupons to Barker as well as to a white coworker. (Dkt. No. 77-8 at 2). Plaintiff also testified that either Mooney or a coworker named Carlos Colon used the term "my people" or "your people" in a racial context, although he could not remember the exact comment. (Dkt. No. 81-25 at 23).

In August 2011, Plaintiff's coworker Monty Martinez ("Martinez") called Plaintiff over in front of others to view a picture of a llama sitting on its legs with the caption "NIGGA STOLE MY LEGS." (Dkt. Nos. 81-25 at 17, 81-3 at 6). Martinez told Barker "they are talking about

---

[1] The coworkers alleged to have made these comments were not African American.
[2] Sgt. Schirrmacher was employed by the Marine Corps, not CSC.
[3] Cpl. Salgado was employed by the Marine Corps, not CSC.

2

you." (Dkt. No. 81-3 at 6). Soon after, Martinez forwarded Plaintiff and others a copy of the picture with a new caption: "FIRST, DAMIEN STOLE MY TICKETS, THEN HE STOLE MY LEGS." (Dkt. Nos. 81-3 at 7, 81-7). Plaintiff alleges that during a subsequent conversation about the incident, Martinez asked him why he was breathing "[Martinez's] air." (Dkt. No. 81-25 at 22). When he asked Martinez what he meant, Martinez reportedly "insinuated" that he should know what that means and that it meant Plaintiff shouldn't breathe his air. *Id.*

Barker spoke about the llama picture incident to Thomas Johnson ("Johnson"), an African American government employee, who discussed it with his supervisor Spence Wade ("Wade"). (Dkt. Nos. 78-1 at 76, 81-3 at 2-3, 81-25 at 23). Plaintiff subsequently filed a formal complaint with CSC on October 12 and an EEOC charge on November 9, 2011. (Dkt. Nos. 90-1, 81-2, 81-17).

*Credit Card Use*

CSC's Timekeeping and Expense Reporting Handbook clearly prohibits use of the CSC credit card for personal charges and requires employees to pay charges and submit expenses for reimbursement. (Dkt. No. 78-2 at 59-60). CSC's Travel Authorization and Expense Procedures state that charging personal expenses on the corporate card may result in termination. (Dkt. No. 78-2 at 68).

Plaintiff received multiple emails from the travel department about his CSC credit card beginning in April 2011. (Dkt. No. 77-5). An email dated April 18 was sent to Barker and Shaw stating that his credit card had a balance of $11,051.51 and "a significant number of purchases appear[ed] to be personal in nature." *Id.* at 115. On June 14, 2011, the travel administrator sent another email to Barker and Shaw, notifying them that Barker's balance was over 60 days past due. (Dkt. No. 77-5 at 117). More emails were sent to Barker on June 28, July 11, and August

3

9. (*Id.* at 119, 120, 122, 123). On August 11, 2011, following discussions with his supervisors, Barker signed a letter agreeing to make minimum payments of $500 per month toward his credit card balance beginning September 1, 2011. (Dkt. No. 77-6 at 9).

On September 19, an email was sent to Pennington and others, stating that Barker's account was over 150 days past due and would become 180 days past due at the end of the month. (Dkt. No. 77-5 at 100). CSC's Global Travel Manager, Megin Dressel, stated that the company would be penalized for Barker's debt at the 180-day mark. (Dkt. No. 77-5 at 3). This penalty would not resolve the balance and Barker would still be responsible for the debt. (Dkt. No. 77-5 at 3).

Pennington stated in his declaration that the email prompted him to ask Shaw to address the issue. (Dkt. No. 77-3 at 4). On October 11, Shaw emailed Barker notifying him that his failure to make payments as agreed was "unacceptable behavior" and stated that she had opened an ER ticket on October 6 to investigate misuse of his CSC credit card. (Dkt. Nos. 77-6 at 11, 81-12). On October 20, Barker made a payment of $500, the only personal payment he made on the credit card, leaving his balance at $9,974.49. (Dkt. No. 77-5 at 9).[4]

On December 9, 2011, Capt. Smith issued a client bar request via email to Pennington requesting Barker's removal from the Marine Corps' contract with CSC. (Dkt. No. 77-3 at 32). CSC was contractually obligated to comply with this request. (Dkt. No. 77-3 at 5). On December 10, Pennington sent an email to Capt. Smith, Shaw, Avenetti, and others, stating that "[a]s discussed, today will be the last shift for [Plaintiff]. He will be removed from the program after today." (Dkt. No. 77-3 at 31). Later that day, Avenetti sent an email informing that Barker had been escorted out of the building. (Dkt. No. 77-3 at 30). Plaintiff was later informed that he

---

[4] Two other payments had been made on the card due to reimbursements by CSC for approved business expenses.

was suspended from employment with CSC. (Dkt. No. 81-18). On December 13, Pennington sent an email to Lydia Gilligan, an ER specialist, stating "I am the director – please terminate" Plaintiff "effective COB 12/11/11." (Dkt. No. 76-1 at 29). Pennington testified at his deposition that he authorized the suspension or termination of Barker for "misconduct and performance." (Id. at 13). On or about May 14, 2012, Pennington notified Barker that his employment would be terminated. (Dkt. No. 81-22 at 18).

## II. DISCUSSION

### A. Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. As the Supreme Court has explained, "this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A dispute over an issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Finally, in making a summary judgment determination, the court must view the facts in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (citations omitted).

The Court finds that there is no genuine issue of material fact with respect to any of the Plaintiff's claims. Plaintiff has not produced sufficient evidence supporting his allegations of a hostile work environment, disparate treatment, or retaliation in violation of 42 U.S.C. § 1981.

### 1. Hostile Work Environment (Count I)

Plaintiff claims that he was subjected to a hostile work environment in violation of 42 U.S.C. § 1981 ("§ 1981"). Establishing a hostile work environment requires a showing that the offending conduct was (1) unwelcome; (2) based on the plaintiff's protected characteristic; (3) sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment; and (4) there is a basis for imposing liability on the defendant. *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183-184 (4th Cir. 2001) (citing *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998)).

To establish that harassment was based on race, a plaintiff must show that but for his race, he would have been treated differently. *See Gilliam v. S. Carolina Dep't of Juvenile Justice*, 474 F.3d 134, 142 (4th Cir. 2007) (citing *Causey*, 162 F.3d at 801).[5] The llama picture containing the word "nigga" was obviously based on race. The comments about Plaintiff driving a "black man's car" can also be construed as racially motivated, as can the "Black Panther handbook" email and the comment that Barker was the "whitest black man" Corporal Salgado had seen.

However, whether the other comments and incidents were related to race is questionable. Barker admitted that he initially thought the comments about fried chicken could be taken "either way." (Dkt. No. 81-25 at 21). It is also unclear from the record what Plaintiff alleges was said about fried chicken. Nor does the evidence establish the context of the "my people/your people" or "watermelon" comments. Plaintiff felt that those terms were used in a racial context, but he could not recall details explaining the content of those comments. A conclusory statement

---

[5] The parties do not dispute that Plaintiff is African American. Barker testified in his deposition that he identifies as two or more races, including African American, Caucasian, and Native American. (Dkt. No. 78-1 at 24).

without specific evidentiary support cannot support a claim of racially motivated harassment. *See Gilliam*, 474 F.3d at 142 (citing *Causey*, 162 F.3d at 801-802). With respect to the comment made by Martinez that Plaintiff should stop breathing his air, Plaintiff's deposition testimony seems to acknowledge that this was likely related to the fact that they were having a contentious conversation about the llama picture incident rather than a statement about race.

There is sufficient evidence that Plaintiff found the comments unwelcome and subjectively abusive. Barker stated he was so offended by the llama picture incident that he took a break from working and prayed. (Dkt. No. 81-25 at 25). He also alleged that he told Cpl. Salgado that her comments offended him. However, the evidence is insufficient to establish that the incidents complained of were *objectively* so pervasive or severe to subject a reasonable person in the plaintiff's position to an abusive working environment.

In determining whether the offending conduct is sufficiently severe or pervasive to establish a hostile working environment, the Court considers the totality of the circumstances. *See Spriggs*, 242 F.3d at 184 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). A plaintiff must show that he subjectively found the environment to be abusive and that a reasonable person in his position would have found the environment objectively hostile or abusive. *Id.* (citations omitted). Relevant factors in this inquiry are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Forklift*, 510 U.S. at 23. "Alternatively, simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Guessous v. Fairview Property Investments, LLC*, No. 1:14-cv-224, 2014 WL 7238993, slip op. at *13 (E.D. Va. Dec. 16, 2014) (quoting *Faragher v.*

7

*City of Boca Raton*, 524 U.S. 775, 788 (1998)) (internal quotation marks omitted). "No employer can lightly be held liable for single or scattered incidents." *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 318 (4th Cir. 2008). The Fourth Circuit has set a "high bar" for plaintiffs to satisfy the objectively severe and pervasive test. *E.E.O.C. v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 176 (4th Cir. 2009) (citing *Sunbelt*, 521 F.3d at 315 (4th Cir. 2008)). *See also Schwapp v. Town of Avon*, 118 F.3d 106, 110-11 (2d. Cir.1997) (holding that "instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments" in order to constitute a hostile work environment) (citations and internal quotation marks omitted).

Certainly the use of the n-word is unacceptable in the work place. *See Spriggs*, 242 F.3d at 185 ("Far more than a 'mere offensive utterance,' the word 'nigger' is pure anathema to African-Americans"). But courts within the Fourth Circuit have refused to hold a defendant liable under arguably worse circumstances than those presented in this case. *See, e.g., Skipper v. Giant Food Inc.*, 68 F. App'x 393, 398 (4th Cir. 2003) (finding that a manager who called the plaintiff a racial slur on one occasion and exposed him to racial graffiti daily did not create an abusive work environment); *Hampton v. J.W. Squire Co.*, No. 4:10-cv-00013, 2010 WL 3927740, at *4 (W.D. Va. Oct. 5, 2010) (finding that a supervisor's use of the n-word three times in one conversation was insufficient to constitute an abusive environment).

Although showing Plaintiff a picture with the word "nigga" was completely inappropriate behavior on Martinez's part, it occurred only once. Replacing that word with Plaintiff's first name was similarly unacceptable, but this too occurred only once. *See Hampton*, 2010 WL 3927740 at *3 ("[B]oth the Fourth Circuit and the District Courts in this circuit have long separate[d] general use of epithets from the single use of a slur") (citations and internal quotation marks omitted). Barker has testified that he did not hear or see the n-word in any other context

8

during his employment with CSC. (Dkt. No. 78-1 at 65). The other incidents, many of which are at best tenuously linked to race, were "sporadic" and did not occur on an "almost daily" basis. *See Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1131 (4th Cir. 1995) (finding sufficient evidence of a hostile work environment where the plaintiff was called racial slurs on an "almost daily" basis for six months). Additionally, none of the alleged comments were made by Barker's supervisors. Viewing the totality of the circumstances, Plaintiff was not subjected to a "steady barrage" of racial slurs that so altered the condition of the workplace to create an objectively abusive and hostile atmosphere.

Because Plaintiff has failed to meet the Fourth Circuit's "high bar" to show an objectively severe and pervasive environment, an essential element of a hostile work environment claim, it is unnecessary to discuss whether plaintiff has established a basis for imposing liability on the defendant.[6]

## 2. Discrimination (Count I)

The plaintiff has also claimed disparate treatment in violation of § 1981 in Count I of the complaint. As there is no direct evidence of discriminatory discharge, the plaintiff must proceed through the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Guessous*, 2014 WL 7238993 at *9 ("The *McDonnell Douglas* burden-shifting framework has been used to evaluate discrimination and retaliation claims under both Title VII and §

---

[6] Although it is unnecessary to decide this issue, the Court notes that whether conduct is imputable to an employer depends on the status of the harasser. When the harasser is a coworker of the plaintiff or a third party, an employer is liable only if the employer "knew or should have known of the harassment and failed to take prompt remedial action reasonably calculated to end the harassment." *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 423 (4th Cir. 2014) (citations and internal quotation marks omitted). All of the offensive comments were allegedly made by Plaintiff's coworkers, not supervisors, and several of the comments Plaintiff complains of were made by employees of the Marine Corps, not CSC employees. The evidence suggests that not all of the comments were imputable to CSC, but the Court finds it unnecessary to address this issue for the reasons discussed above.

1981"). If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for the action.

> The defendant's burden is one of production, not persuasion. It can involve no credibility assessment, that is, the defendant does not need to persuade the court that it was actually motivated by the proffered reasons as long as those reasons, if believed by the jury, would be legally sufficient to justify a judgment for the defendant. If the defendant meets its burden of production, the presumption raised by the prima facie case is rebutted.

*Id.* (internal citations omitted).

If the employer carries this burden, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the offered reason was not the defendant's true reason, but was a pretext for discrimination. *Id.* (citing *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981). This burden merges with the plaintiff's ultimate burden of persuading the court that the defendant discriminated against him. *Id.* (citing *Burdine*, 450 U.S. at 256).

To make out a prima facie case of disparate treatment, a plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for the job and his performance satisfied his employer's expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside his protected class received more favorable treatment. *See Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). CSC argues that Plaintiff cannot establish either the second or the fourth elements of the prima facie case. (Dkt. No. 75 at 16). Barker argues that his suspension and termination occurred under circumstances giving rise to an inference of discrimination. (Dkt. No. 81 at 23). This argument fails because Plaintiff has not introduced any supporting evidence, such as evidence that that his position was filled by a similarly qualified applicant who was not African American, or that similarly situated employees of other races were treated differently. The complete dearth of evidence supporting the fourth element makes it unnecessary to decide whether Plaintiff satisfied the second element.

### 3. Retaliation (Count II)

Plaintiff claims that he was terminated in December and again in May in retaliation for his protected activities.[7] In the absence of direct evidence of retaliation, the plaintiff's claim must proceed under the *McDonnell Douglas* framework discussed above. In order to state a prima facie case of retaliation, a plaintiff must show that he (1) engaged in a protected activity; (2) suffered an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action. *See Harris v. Home Sales Co.*, 499 F. App'x 285, 293 (4th Cir. 2012) (citation omitted).[8]

Protected activity may be in the form of participation or opposition. *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). A protected participation activity occurs if an employee makes a charge, testifies, assists, or participates "in any manner in an investigation, proceeding, or hearing under Title VII." *Id.* (citation omitted). Protected opposition activity "encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Id.* (citation omitted). The Fourth Circuit has "typically found…informal complaints to be protected when they are made by the employee to the employer." *Pitrolo v. Cnty. of Buncombe, N.C.*, No. 07-2145, 2009 WL 1010634, at *3 (4th Cir. Mar. 11, 2009) (citations omitted). In order for an activity to qualify as protected opposition, a

---

[7] Plaintiff argues that he was terminated rather than suspended in December. The distinction is not material for purposes of this claim, since a suspension under these circumstances would be an adverse action, as would a termination. *See Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (stating that an adverse employment decision in the retaliation context is one that might well have dissuaded a reasonable worker from making or supporting a charge of discrimination).

[8] It is "well-settled" in this circuit that plaintiffs must satisfy the same elements to state a claim of retaliation under either § 1981 or Title VII. *See, e.g., Jenkins v. Gaylord Entm't Co.*, 840 F. Supp. 2d 873, 880 (D. Md. 2012) (citations omitted). *See also Brown v. Triton Sec.*, No. 1:04-cv-1544, 2005 WL 2708914, *5 (E.D. Va. Oct. 19, 2005).

11

plaintiff must reasonably believe that his employer was engaging in unlawful employment practices. *See Jackson v. Nattrass*, No. 3-13-cv-535, 2014 WL 3697505, slip op. at *6 (E.D. Va. July 23, 2014) (citing *Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 341 (4th Cir. 2006). The Fourth Circuit applies a balancing test for determining whether a plaintiff has engaged in protected opposition activity. *See Laughlin*, 149 F.3d at 259 (citing *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir. 1981).

The court may infer a causal link where the plaintiff has submitted evidence showing a "close temporal proximity" between the time the employer learned of the protected activity and the time of the alleged retaliatory act. *See Guessous*, 2014 WL 7238993 at *14 (citations omitted). Plaintiff must show that the person who engaged in the retaliatory act knew of his activities. *See Nattrass*, 2014 WL 3697505 at *8 ("[T]he decision-making supervisor's knowledge of the protected activity is still essential" at the prima facie stage) (citing *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)).

In *Nassar*, the Supreme Court held that plaintiffs bringing retaliation claims under Title VII must demonstrate that "the desire to retaliate" was the but-for cause of the adverse action, rather than a motivating factor. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013). District courts within the Eastern District of Virginia have applied *Nassar*'s but-for causation requirement to § 1981 retaliation claims. *See, e.g., Guessous*, 2014 WL 7238993 at *14 (applying but-for causation requirement of *Nassar* to § 1981 retaliation claim); *Proctor v. Fairfax Cnty. Fire Dep't*, No. 1:13-cv-1427, 2014 WL 6473712, slip op. at *3 (E.D. Va. Nov. 14, 2014). (applying *Nassar* to the plaintiff's Title VII and § 1981 retaliation claims).[9]

---

[9] Courts in other circuits have also held that *Nassar* applies to § 1981 claims. *See, e.g., Welch v. Eli Lilly & Co.*, No. 1:10-cv-01705, 2013 WL 4413323, at *19 (S.D. Ind. Aug. 15, 2013) ("[T]his Court concludes that, after Nassar, [Plaintiff] is required to show 'but-for' causation for

12

However, *Nassar* did not address whether but-for causation applies at the prima facie stage or the pretext stage.[10] This Court finds it unnecessary to resolve that issue, because even if Plaintiff has made out a prima facie case, he has not established but-for causation at the pretext stage. *See Castonguay v. Long Term Care Mgmt. Serv., LLC*, No. 1:11-cv-682, 2014 WL 1757308, slip op. at *7 (M.D.N.C. Apr. 30, 2014) (finding it was unnecessary to "resolve where in the burden-shifting approach the 'but-for' test applies and how the temporal proximity fits into that analysis" because plaintiff could not "establish sufficient evidence of 'but-for' causation even at the pretext stage."

---

her retaliation claim under § 1981"); *Shumate v. Selma City Bd. of Educ.*, No. 11-00078, 2013 WL 5758699, at *2 (S.D. Ala. Oct. 24, 2013) ("Absent a clear signal that *Nassar's* holding unsettled [binding authority treating claims under § 1981 the same as Title VII claims], the court will not apply a different standard to Shumate's § 1981 claim than it does to her claim under Title VII") aff'd 581 F. App'x 740, 742-743 (11th Cir. 2014) (finding that the district court did not err in holding that the plaintiff did not satisfy *Nassar*'s causation standard); *Wright v. St. Vincent Health Sys.*, 730 F.3d 732, 738 n.5 (8th Cir. 2013) ("In light of *Nassar* and our precedent, it is now definitively established that the determining-factor standard logically must be met in both Title VII and § 1981 retaliation cases"); *Alexander v. City of N.Y.*, 957 F. Supp. 2d 239, 249 (E.D.N.Y. 2013) (stating that *Nassar's* but-for causation requirement applied to § 1981 retaliation claims); *Parker v. Chilton Cnty. Bd. of Educ.*, No. 2:12-cv-0650, 2014 WL 116341, at *10 n.9 (M.D. Ala. Jan. 13, 2014) ("Given the *Nassar* Court's reasoning that, 'absent an indication to the contrary in the statute itself,' but for causation is 'the default rule[ ]' that Congress is presumed to have incorporated into a statute creating an intentional tort, the Court applies the but for causation requirement to Parker's retaliation claim under § 1981. This also accords with well-established precedent analyzing Title VII and § 1981 claims identically") (internal citations omitted) (alteration in original). *But see Battle v. Truland Sys. Corp.*, 30 F. Supp. 3d 9, 24 n.8 (D.D.C. 2014) (finding it unnecessary to decide whether *Nassar* applied to § 1981 claims, because the evidence was insufficient to prove causation under either a "but-for" or "motivating factor" causation standard).

[10] Some courts within this circuit have found that *Nassar* has not altered the plaintiff's ability to make a prima facie showing of causation. *See, e.g., Guessous*, 2014 WL 7238993 at *14; *Ford v. Berry Plastics Corp.*, No. 12-0977, 2013 WL 5442355, at *10, n.8 (D. Md. Sept. 27, 2013). *But see Mallik v. Sebelius*, 964 F. Supp. 2d 531, 550-51 (D. Md. 2013) (concluding that the plaintiff had not established a prima facie case of retaliation because he had not shown that the defendant's adverse actions were taken only for purposes of retaliating against him for filing an EEOC complaint).

13

Barker's suspension in December occurred within a short enough timeframe following his complaint to Johnson sometime in September or October to establish a prima facie causal link. *See e.g., Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (holding that a four month period was sufficient to establish prima facie causal connection). The key question is whether Plaintiff's complaint to Johnson constituted protected activity, as this is the only complaint of which Pennington, the relevant decision-maker, was aware before he suspended Barker. When Plaintiff complained to Johnson, he apparently had a subjective belief that he was being subjected to a hostile work environment. Although the incident Plaintiff complained of did not give rise to a hostile work environment, his belief was reasonable, given that he had been shown the n-word by a co-worker and felt that this was the culmination of racially charged comments. *See Gage v. Golden Corral Corp.*, No. 5:13-cv-132, 2014 WL 1399447, slip op. at *7 (E.D.N.C. Apr. 10, 2014) (finding that the plaintiff's belief was objectively reasonable even where the work environment was not necessarily hostile as a matter of law).

However, it does not appear that Plaintiff's complaint to Johnson was intended to voice opposition to his employer's allegedly unlawful practices. *See Pitrolo*, 2009 WL 1010634 at *3 (finding that the plaintiff's complaints to her father did not qualify as protected opposition activity under Title VII where there was "no evidence that Pitrolo intended for her father to pass along her complaints to Defendants"); *Harris-Rogers v. Ferguson Enter.*, No. 5:09-cv-78, 2011 WL 4460574, at *7 (E.D.N.C. Sept. 26, 2011) (finding that the plaintiff had not voiced opposition where she mistakenly sent a mass email to recipients including management personnel, but had only intended to send the email to one fellow employee). After Barker disclosed the incident involving the llama picture, Johnson informed Barker that he had an obligation to report the incident to his supervisor, Wade. After doing so, Johnson informed

Barker that he would further have to report the incident to Barker's supervisors. However, Plaintiff has not presented evidence that he intended for Johnson or Wade to relay his complaints to anyone at CSC, although that is ultimately what they did. Nor is there evidence in the record indicating that Plaintiff spoke to Johnson because he knew that Johnson was required to report the incident. Barker stated that he went to Johnson when the harassment became "too much to handle," since Johnson is also African American and had "recently worked as a contractor on the help desk." (Dkt. No. 81-3 at 2-3). He testified that he asked Johnson whether Johnson had "experienced any issues." (Dkt. No. 78-1 at 76). It appears that Barker sought advice from Johnson about how to deal with the situation. The Court is therefore not convinced that Plaintiff's complaint to Johnson was a purposeful attempt to voice opposition or "bring attention to the alleged discriminatory conduct." *Pitrolo*, 2009 WL 1010634 at *3.

Even if Plaintiff had made out a prima facie case of retaliation, CSC has met its burden to produce evidence that Barker was suspended and terminated due to misuse of his CSC credit card.[11] Plaintiff has not carried his burden to show that the offered reason was a pretext for retaliation. First, it is undisputed that Barker improperly made personal purchases on his credit card and failed to pay the balance as required. Second, there is insufficient evidence that Barker's complaint to Johnson motivated Pennington's decision to suspend and terminate him.

Plaintiff argues that an email from Avenetti to Pennington shows that CSC's offered reason is pretext. In the email, Avenetti listed "several incidents" that he believed made Barker unsuitable for his position. Avenetti stated in the email that Barker had complained to a government civilian about the incident involving Martinez and that Barker refused to produce the

---

[11] CSC has offered multiple reasons for its suspension and termination of Barker, including the client bar request, attendance issues, and Barker's loss of his security clearance. (Dkt. No. 75 at 19-21). The Court finds it unnecessary to analyze these additional reasons, as Barker's credit card misuse is sufficient to rebut the prima facie case.

emails upon Avenetti's request. As discussed above, Plaintiff's complaint to Johnson was not a protected activity. However, even if the complaint to Johnson were a protected activity, this email is insufficient evidence of pretext because Pennington was the relevant decision-maker.

Plaintiff points to two documents in the record to argue that Avenetti was actually the decision-maker. In its EEOC statement, CSC stated that the client bar request coupled with Plaintiff's failure to make his credit card payments "made [Avenetti] feel very comfortable with immediately suspending Barker without pay." (Dkt. No. 81-20 at 4). Also, the summary report of an internal CSC investigation stated that "Avenetti suspended Barker." (Dkt. No. 81-15 at 11). Viewing this in the light most favorable to the plaintiff, neither document contradicts the evidence that once Pennington made the decision to suspend Barker, Avenetti executed that decision as Barker's day-to-day supervisor.

Even if Avenetti's email influenced Pennington's decision, the email actually listed multiple legitimate, nondiscriminatory reasons why Avenetti thought Barker should be terminated, including his credit card misuse. The evidence is simply insufficient to show that but for his alleged protected activities, Barker would not have been suspended in December or terminated in May. For the foregoing reasons, the defendant is entitled to summary judgment on this claim.

### B. Motion to Strike

The defendant has moved to strike three of Plaintiff's exhibits: (1) Exhibit A, Plaintiff's Declaration; (2) Exhibit C, Plaintiff's Office of Federal Contract Compliance Programs (OFCCP) Complaint; and (3) Exhibit V, images of text messages.

1. Exhibit A

Exhibit A to the plaintiff's opposition is a declaration signed by Barker and dated October 30, 2014. (Dkt. No. 81-1). CSC argues that Paragraphs 6, 8, 9, 10, and 11 of the plaintiff's declaration should be stricken because the statements constitute hearsay. (Dkt. No. 87 at 4). Plaintiff argues that the statements are not hearsay because they are not offered for the truth of the matter asserted. (Dkt. No. 92 at 2). The Court finds that Paragraphs 6 and 8 are inadmissible hearsay, as both paragraphs recount statements that the plaintiff alleges were spoken to him by someone else and both statements are offered for the truth of the matter asserted. Paragraph 8 does not even identify a declarant, merely stating that Barker "had heard" that Johnson experienced racial harassment. Accordingly, these paragraphs are stricken from the record. Paragraphs 9-11, however, are not inadmissible hearsay, and may be used to show the plaintiff's subjective intent and motive in bringing his complaints of discrimination and retaliation.

2. Exhibit C

Exhibit C is the plaintiff's complaint to the Office of Federal Contract Compliance Programs (OFCCP). (Dkt. No. 81-3). The defendant argues that Exhibit C should be stricken because it is unsigned, unsworn, and unauthenticated. (Dkt. No. 87 at 5). However, the plaintiff submitted in response a signed copy of the complaint and an authenticating letter from OFCCP after issuing a Freedom of Information Act request to OFCCP. (Dkt. Nos. 92-2, 92-3). The Court finds that the OFCCP complaint is admissible because Barker can testify independently to the events described therein.

3. Exhibit V

Exhibit V is a printout of a purported text message exchange between Capt. Smith and Sgt. Schirrmacher. (Dkt. No. 81-21). CSC argues that Exhibit V should be stricken because the text messages are unauthenticated. (Dkt. No. 87 at 5). Plaintiff argues that he authenticated the text messages at his deposition and in the declaration submitted as Exhibit 1 to his opposition to the motion to strike. (Dkt. No. 92 at 3-6).

The Court finds that Plaintiff did not adequately authenticate the text messages at his deposition. Barker testified that he determined the phone belonged to Capt. Smith. (Dkt. No. 78-1 at 68). But he could not recall at the time of his deposition when he found the phone, other than that it occurred sometime after he made complaints about discrimination in October. *Id.* at 69. Nor did he remember how he copied the messages, although he guessed that he "might have" taken a picture of the messages. *Id.* at 68-69. He could not recall how he accessed the messages, or what he did with the phone after he copied the messages. *Id.* at 69-70. The Court also declines to accept as authentication of the text messages the declaration signed on November 18, 2014 and filed as Exhibit 1 to the plaintiff's opposition to the motion to strike. Accordingly, Exhibit V and Exhibit 1 (the declaration) are stricken.

III. CONCLUSION

For the foregoing reasons, it is ORDERED that summary judgment is GRANTED. An appropriate order shall issue.

Alexandria, Virginia
March 27, 2015

### 3. Exhibit V

Exhibit V is a printout of a purported text message exchange between Capt. Smith and Sgt. Schirrmacher. (Dkt. No. 81-21). CSC argues that Exhibit V should be stricken because the text messages are unauthenticated. (Dkt. No. 87 at 5). Plaintiff argues that he authenticated the text messages at his deposition and in the declaration submitted as Exhibit 1 to his opposition to the motion to strike. (Dkt. No. 92 at 3-6).

The Court finds that Plaintiff did not adequately authenticate the text messages at his deposition. Barker testified that he determined the phone belonged to Capt. Smith. (Dkt. No. 78-1 at 68). But he could not recall at the time of his deposition when he found the phone, other than that it occurred sometime after he made complaints about discrimination in October. *Id.* at 69. Nor did he remember how he copied the messages, although he guessed that he "might have" taken a picture of the messages. *Id.* at 68-69. He could not recall how he accessed the messages, or what he did with the phone after he copied the messages. *Id.* at 69-70. The Court also declines to accept as authentication of the text messages the declaration signed on November 18, 2014 and filed as Exhibit 1 to the plaintiff's opposition to the motion to strike. Accordingly, Exhibit V and Exhibit 1 (the declaration) are stricken.

### III. CONCLUSION

For the foregoing reasons, it is ORDERED that summary judgment is GRANTED and this case shall be dismissed. An appropriate order shall issue.

Alexandria, Virginia
March 27, 2015

/s/
Liam O'Grady
United States District Judge